UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

| | |
|---|---|
| JONATHAN WATERS, | CASE NO. C21-0087JLR |
| Plaintiff, | ORDER |
| v. | |
| CHRISTOPHER MITCHELL, et al., | |
| Defendants. | |

## I.   INTRODUCTION

Before the court is Plaintiff Jonathan Waters's renewed motion for entry of default judgment against Defendants Christopher Mitchell and Jane Doe Mitchell (collectively, "the Mitchells") pursuant to Federal Rule of Civil Procedure 55(b)(2) and Local Rule 55(b)(2).  (Mot. (Dkt. # 28); 4/24/23 Waters Decl. (Dkt. # 31); 4/24/23 Luhrs Decl. (Dkt. # 30); Supp. Brief (Dkt. # 33); 4/27/23 Luhrs Decl. (Dkt. # 34).)  The court has considered Mr. Waters's submissions, the balance of the record, and applicable law.

1  Being fully advised, the court GRANTS in part and DENIES in part Mr. Waters's

2  motion.

3  ## II.   BACKGROUND

4      The court reviews the factual and procedural background relevant to Mr. Waters's

5  motion for default judgment.

6  **A.   Factual Background**

7      The Mitchells employed Mr. Waters as a seaman aboard their vessel, the F/V

8  KULEANA (the "Vessel"), for the duration of the 2018 Bristol Bay gillnet sockeye

9  salmon season, beginning in May or June.  (Am. Compl. (Dkt. # 12) ¶¶ 3-6.)  While

10  aboard the Vessel and performing crew work on or about June28, 2018, Mr. Waters

11  "stepped on a stair that gave way and flipped forward . . . causing [him] to fall and injure

12  both knees."  (*Id*. ¶ 8.)  According to Mr. Waters, the stair was "hinged and designed to

13  flip forward to create an opening for engine access but was supposed to be securely

14  latched."  (*Id*. ¶ 9.)  At the time of Mr. Waters's injury, the latch had not been secured.

15  (*Id*.)  Mr. Waters alerted Mr. Mitchell to his injury and asked for medical treatment, but

16  Mr. Mitchell denied the request.  (*Id*. ¶¶ 18, 22.)

17      Mr. Waters remained on the vessel until July 4, 2018, when the Mitchells

18  discharged him from service, "put [Mr. Waters] on a beach in a remote area of Alaska[,]

19  and provided [him] no funds for medical care, food, lodging, or travel home."  (*Id*.

20  ¶¶ 20-23.)  Mr. Waters believes that, absent his injury, he would have continued working

21  on the Vessel until July 31, 2018, when the Bristol Bay Salmon season ended.  (4/1/22

22

1    Waters Decl. (Dkt. # 7) ¶ 7.[1])  According to Mr. Waters, the Mitchells never paid him for

2    any work performed on the Vessel.  (Am. Compl. ¶¶ 19-22.)  Mr. Waters estimates he

3    should have been paid at least $14,000 for work performed pursuant to a verbal contract

4    he had with Mr. Mitchell.  (*Id*. ¶ 20; 4/1/22 Waters Decl. ¶¶ 2, 6 & n.2.)

5            After the Mitchells left Mr. Waters on a remote beach, Mr. Waters states that he

6    received some medical care at the Camai Community Health Center in Alaska and Skagit

7    Valley Hospital in Washington.  (*See id*. ¶¶ 8-10.)  Mr. Waters complains that he was

8    dissatisfied with the level of care he received at Skagit Valley Hospital.  (*See id*. ¶¶ 9-10

9    (describing the care as "haphazard and unhelpful" and stating, "I believe I would have

10   obtained more and better medical treatment if defendant had helped me find actual

11   doctors to examine and treat me").)  Mr. Waters provides invoices from these medical

12   providers, totaling $208.00 from the Camai Community Health Center and $2,404.00

13   from Skagit Valley Hospital.  (*See* 1st DJ Mot. (Dkt. # 6), Ex. 6 ("Camai Invoice"); *id.*,

14   Ex. 9 ("Skagit Invoice").)

15           Mr. Waters stayed with his parents from approximately July 7, 2018 until January

16   15, 2019, and estimates that his parents, who did not charge him for rent or food, incurred

17   $400 per month for his food and $800 per month for his lodging.  (4/1/22 Waters Decl.

18   ¶¶ 9-11.)  Mr. Waters asserts that his injury aboard the Vessel exacerbated prior knee

19

20
         _____

21           [1] Mr. Waters relies on declarations and exhibits submitted with his first motion for
     default judgment to substantiate his damages.  (*See, e.g.*, Mot. at 10 (citing a number of exhibits
     attached to first motion for default judgment, in addition to declarations filed in support of the
     motion).)  The court incorporates these documents by reference into its consideration of the
22   current motion for default judgment on the operative complaint.

injuries and prevented him from taking advantage of work opportunities, and estimates that in 2019 and 2020, he lost approximately $20,849 in earnings each year due to his injury.  (*Id*. ¶ 24.)  Mr. Waters further estimates that he lost $3,698 in earnings in 2021 because of the injury.  (*Id*. ¶ 25.)  In 2022, Mr. Waters worked as a used car salesman and currently works as a community solar salesman; both jobs are more lucrative than commercial fishing, but Mr. Waters speculates he may not be able to sustain them due to economic factors or his knee injury.  (*Id*. ¶¶ 26-28; 4/24/23 Waters Decl. ¶ 5.)

Mr. Waters states that he continues to suffer knee pain he attributes to his injury aboard the Vessel and has had to forgo activities such as exercising and playing with his children as a result.  (4/1/22 Waters Decl. ¶ 28; 4/24/23 Waters Decl. ¶ 4.)  Mr. Waters has not received medical care for his knee injury since his July 2018 visits to Skagit Valley Hospital.  (*See* 4/24/23 Waters Decl. ¶ 6 ("I have not been to the doctor because I have no medical insurance, but am planning to take a break soon to go back to WA and see a doctor.").)

**B.   Procedural Background**

Mr. Waters filed this action against the Mitchells on January 25, 2021, seeking damages for his injuries due to the fall as well as unpaid wages, punitive damages, and attorney's fees.  (*See* Compl. (Dkt. # 1); Am. Compl. ¶¶ 4, 6, 8-16.)  Mr. Waters timely served the Mitchells, but they failed to respond to the complaint or appear in this action.  (*See generally* Dkt; 2/1/21 Aff. of Service (Dkt. # 4).)  Mr. Waters later moved for default judgment, which the court denied without prejudice.  (*See* 4/28/22 Order (Dkt. # 11).)  Mr. Waters filed an amended complaint on May 17, 2022, and timely served the

1    Mitchells on September 27, 2022.[2]  (*See* 9/27/22 Aff. of Serv. (Dkt. # 21).)  The

2    Mitchells have failed to respond to the amended complaint or appear in this action.  (*See*

3    *generally* Dkt.)

4         Mr. Waters brings claims against the Mitchells for:  (1) unpaid wages for crew

5    work performed, as well as a double wage penalty for willfully withheld wages pursuant

6    to the Washington Wage Rebate Act ("WRA"), RCW 49.52.070; (2) negligence under

7    the Jones Act, 46 U.S.C. § 30104; (3) unseaworthiness under general maritime law;

8    (4) maintenance, cure, and unearned wages under general maritime law; and (5) punitive

9    damages for callous and willful non-payment of maintenance and cure.  (*See* Am. Compl.

10   ¶¶ 17-25.)  Mr. Waters also seeks attorney's fees for his WRA and maintenance and cure

11   claims.  (Mot. at 11, 14, 17.)  On October 26, 2022, the Clerk entered default against the

12   Mitchells.  (10/26/22 Order (Dkt. # 24).)  Mr. Walters now asks the court to enter a

13   default judgment in the amount of $214,474, itemized as follows:

14       | Unpaid Wages            | $14,123 |
         |-------------------------|---------|
         | Double Wage Penalty     | $28,246 |
15       | Unearned Wages          | $14,123 |
         | Cure                    | $2,612  |
16       | Maintenance             | $7,720  |
         | Punitive Damages        | $48,910 |
17       | Lost Earnings to Date   | $45,396 |
         | Future Lost Earnings    | $11,094 |
18       | Pain and Loss of Enjoyment | $30,000 |
         | Attorney's Fees         | $12,250 |
19
     (Mot. at 10-17.)
20

21   _____

22   [2] For good cause shown, the court extended Mr. Waters's deadline to serve the Mitchells.
     (6/21/22 Order (Dkt. # 19).)

1

### III.    ANALYSIS

2    The court reviews the relevant legal standard before discussing Mr. Waters's motion.

3    **A.    Legal Standard**

4    If a defendant fails to plead or otherwise defend, the clerk enters the party's

5    default. Fed. R. Civ. P. 55(a). Then, upon a plaintiff's request or motion, the court may

6    grant default judgment for the plaintiff. *Id.* 55(b)(2). Entry of default judgment is left to

7    the court's sound discretion. *Aldabe v. Aldabe*, 616 F.2d 1089, 1092 (9th Cir. 1980).

8    Because granting or denying relief is within the court's discretion, a defendant's default

9    does not automatically entitle a plaintiff to a court-ordered judgment. *Id.* In exercising

10   its discretion, the court considers the seven *Eitel* factors: (1) the possibility of prejudice

11   to the plaintiff if relief is denied; (2) the substantive merits of the plaintiff's claims;

12   (3) the sufficiency of the claims raised in the complaint; (4) the sum of money at stake in

13   relationship to the defendant's behavior; (5) the possibility of a dispute concerning

14   material facts; (6) whether default was due to excusable neglect; and (7) the preference

15   for decisions on the merits when reasonably possible. *Eitel v. McCool*, 782 F.2d 1470,

16   1471-72 (9th Cir. 1986).

17   Default judgment is a two-step process: first, the court determines that a default

18   judgment should be entered; then, it determines the amount and character of the relief

19   that should be awarded. *TeleVideo Sys., Inc. v. Heidenthal*, 826 F.2d 915, 917-18 (9th

20   Cir. 1987). At the default judgment stage, well-pleaded factual allegations in the

21   complaint, except those related to damages, are considered admitted and are sufficient to

22   establish a defendant's liability. *Geddes v. United Fin. Grp.*, 559 F.2d 557, 560 (9th Cir.

1977); Fed. R. Civ. P. 8(b)(6); *TeleVideo*, 826 F.2d at 917-18.  The court must ensure that

the amount of damages is reasonable and demonstrated by the plaintiff's evidence.[3]  *See*

Fed. R. Civ. P. 55(b); *TeleVideo*, 826 F.2d at 917-18; *LG Elecs., Inc. v. Advance Creative*

*Comput. Corp.*, 212 F. Supp. 2d 1171, 1178 (N.D. Cal. 2002) ("[T]he evident policy of

[Rule 55(b)] is that even a defaulting party is entitled to have its opponent produce some

evidence to support an award of damages.").  And "[a] default judgment must not differ

in kind from, or exceed in amount, what is demanded in the pleadings."  Fed. R. Civ. P.

54(c).

**B.    Jurisdiction**

"To avoid entering a default judgment that can later be successfully attacked as

void, a court should determine whether it has the power, i.e., the jurisdiction, to enter the

judgment in the first place."  *In re Tuli*, 172 F.3d 707, 712 (9th Cir. 1999).  First, there

can be no reasonable dispute that the court has subject matter jurisdiction over this

matter.  Mr. Waters filed this case to enforce his rights under the Jones Act, and pursuant

to the court's admiralty jurisdiction.  *See* 28 U.S.C. § 1333(1) (granting federal courts

original jurisdiction over any civil case of admiralty or maritime jurisdiction).  The court

---

[3] Additionally, this court's Local Rules require plaintiffs to support a motion for default judgment with:

> a declaration and other evidence establishing [the] plaintiff's entitlement to a sum certain and to any nonmonetary relief sought.  [The] [p]laintiff shall provide a concise explanation of how all amounts were calculated, and shall support this explanation with evidence establishing the entitlement to and amount of the principal claim, and, if applicable, any liquidated damages, interest, attorney's fees, or other amounts sought.

Local Rules W.D. Wash. LCR 55(b)(2).

has supplemental jurisdiction over Mr. Waters's state law claim for unpaid wages.  *See* 28 U.S.C. § 1367(a) (stating that "in any civil action of which the district courts have original jurisdiction, the district courts shall have supplemental jurisdiction over all other claims that . . . form part of the same case or controversy").

Second, the court may exercise personal jurisdiction over the Mitchells because, according to Mr. Waters, they are residents of Washington State and were served with a summons and copy of the complaint.  (Am. Compl. ¶ 2; 9/27/22 Aff. of Serv.); Fed. R. Civ. P. 4(k)(1)(A) ("Serving a summons . . . establishes personal jurisdiction over a defendant[] who is subject to the jurisdiction of a court of general jurisdiction in the state where the district is located."); *Panavision Int'l, L.P. v. Toeppen*, 141 F.3d 1316, 1320 (9th Cir. 1998) (stating that a court may exercise general jurisdiction over a defendant if the defendant is domiciled in the forum state).

## C.   Whether the *Eitel* Factors Favor Default Judgment

The court analyzes each *Eitel* factor and concludes that the factors weigh in favor of default judgment with respect to Mr. Waters's claims under the Jones Act, the WRA, and for maintenance and cure under general maritime law.

### 1.   The Possibility of Prejudice to the Plaintiff

Under this factor, default judgment is favored where "the plaintiff has 'no recourse for recovery' other than default judgment." *Curtis v. Illumination Arts, Inc.*, 33 F. Supp. 3d 1200, 1211 (W.D. Wash. 2014) (quoting *Philip Morris USA, Inc. v. Castworld Prods., Inc.*, 219 F.R.D. 494, 499 (C.D. Cal. 2003)); *see also Elektra Entm't Grp. Inc. v. Crawford*, 226 F.R.D. 388, 391 (C.D. Cal. 2005) (concluding denial of default judgment

would prejudice plaintiffs because defendants' failure to participate in the litigation would deny plaintiffs "the right to judicial resolution" of their claims).

Here, despite timely service of process in February 2021 and again in September 2022, the Mitchells have failed to appear[4] or defend themselves in this litigation. (*See* Dkt.) Accordingly, Mr. Waters will be prejudiced if default judgment is not entered, and this factor thus weighs in favor of default judgment.

2.   The Substantive Merits and Sufficiency of the Complaint

The second and third *Eitel* factors—the substantive merits of the plaintiff's claim and the sufficiency of the plaintiff's complaint—are frequently analyzed together. *PepsiCo, Inc. v. Cal. Sec. Cans*, 238 F. Supp. 2d 1172, 1175 (C.D. Cal. 2002). For these two factors to weigh in favor of default judgment, the complaint's allegations must be sufficient to state a claim for relief. *Danning v. Lavine*, 572 F.2d 1386, 1388 (9th Cir. 1978). A complaint satisfies this standard when the claims "cross the line from the conceivable to plausible." *Ashcroft v. Iqbal*, 556 U.S. 662, 680 (2009) ("A pleading that offers 'labels and conclusions' or 'a formulaic recitation of the elements of a cause of

---

[4] On April 12, 2023, Mr. Luhrs informed Mr. Mitchell of Mr. Waters's intent to pursue default judgment via a letter (4/27/23 Luhrs Decl. ¶ 1, Ex. 20), and Mr. Mitchell called Mr. Luhrs on April 24, 2023 in response (*id.* ¶ 7; *see also* Supp. Brief). Mr. Mitchell did not attempt to settle the case. (*See* 4/27/23 Luhrs Decl. ¶¶ 7-9.) The court does not consider this exchange "an appearance" under Rule 55(b)(2). *See* Fed. R. Civ. P. 55(b)(2) (requiring the party moving for default judgment to serve the allegedly defaulting party with written notice at least 7 days before the hearing, if the allegedly defaulting party has appeared); *Direct Mail Specialists, Inc. v. Eclat Computerized Techs., Inc.*, 840 F.2d 685, 689 (9th Cir. 1985) (concluding that the defendant's acknowledgment of the lawsuit in a single conversation was not an "appearance" under Rule 55(b)(2) because defendant did not demonstrate a clear purpose to defend the suit). Regardless, Mr. Waters informed the Mitchells in writing of his intent to seek default judgment twelve days before filing the instant motion. (*See* Dkt.; 4/27/23 Luhrs Decl. ¶¶ 2-4.)

1  action will not do.'  Nor does a complaint suffice if it tenders 'naked assertion[s]' devoid

2  of 'further factual enhancement.'"  (citations omitted) (quoting *Bell Atl. Corp. v.*

3  *Twombly*, 550 U.S. 544, 555, 557 (2007))); *In re Singh*, Bankruptcy No. 10-42050-D-7,

4  2013 WL 5934299, at *3 (Bankr. E.D. Cal. Nov. 4, 2013) (stating that "a complaint [that]

5  is well-pleaded and sets forth plausible facts—not just parroted statutory or boilerplate

6  language" supports granting default judgment).

7       In evaluating the plaintiff's claims, the court "takes 'the well-pleaded factual

8  allegations' in the complaint 'as true'"; however, a "defendant is not held to admit facts

9  that are not well-pleaded or to admit conclusions of law." *DIRECTV, Inc. v. Hoa Huynh*,

10  503 F.3d 847, 854 (9th Cir. 2007) (first quoting *Cripps v. Life Ins. Co. of N. Am.*, 980

11  F.2d 1261, 1267 (9th Cir. 1992) (stating that "necessary facts not contained in the

12  pleadings, and claims which are legally insufficient, are not established by default"); and

13  then quoting *Nishimatsu Constr. Co. v. Hous. Nat'l Bank*, 515 F.2d 1200, 1206 (5th Cir.

14  1975)).  "As a result, where the allegations in a complaint are not 'well-pleaded,' liability

15  is not established by virtue of the defendant's default and default judgment should not be

16  entered." *See Adobe Sys., Inc. v. Tilley*, No. C09-1085 PJH, 2010 WL 309249, at *3

17  (N.D. Cal. Jan. 19, 2010).

18       Here, the substantive merits and sufficiency of Mr. Waters's complaint weigh in

19  favor of default judgment with respect to Mr. Waters's Jones Act negligence claim, WRA

20  claim, and claim for maintenance and cure.  Below, the court reviews each of Mr.

21  Waters's claims for relief.

22

1        *a. The Jones Act Negligence Claim*

2        The Jones Act permits a "seaman injured in the course of employment" to recover

3   damages against his employer. 46 U.S.C. § 30104. "The employer of a seaman owes the

4   seaman a duty under the Jones Act" to use reasonable care to ensure that the seaman has

5   a "safe place to work." *Ribitzki v. Canmar Reading & Bates, Ltd. P'ship*, 111 F.3d 658,

6   662-63 (9th Cir. 1997), *as amended on denial of reh'g and reh'g en banc* (June 5, 1997).

7   To establish a cause for negligence under the Jones Act, a claimant must show "duty,

8   breach, notice and causation." *Id*. at 662. Duty attaches if the defendant employed the

9   plaintiff as a "seaman." *See id*. A plaintiff demonstrates his "seaman status" by

10  plausibly pleading that (1) his duties "contribute to the function of the vessel or to the

11  accomplishment of its mission," and (2) his "connection to a vessel in navigation" is

12  "substantial in terms of both its duration and its nature." *Chadris, Inc. v. Latsis*, 515 U.S.

13  347, 368 (1995); *see also Scheuring v. Traylor Bros., Inc.*, 476 F.3d 781, 786 (9th Cir.

14  2007) ("The crux of the second prong of the 'seaman' test involves distinguishing

15  land-based from sea-based employees").

16        "To recover on his Jones Act [negligence] claim, [the plaintiff] must establish that

17  his employer . . . , or one of [their] agents, was negligent and that this negligence was a

18  cause, however slight, of his injuries." *Ribitzki*, 111 F.3d at 662 (quoting *Havens v. F/T*

19  *Polar Mist*, 996 F.2d 215, 218 (9th Cir. 1993)). "The 'quantum of evidence necessary to

20  support a finding of Jones Act negligence is less than that required for common law

21  negligence, . . . and even the slightest negligence is sufficient to sustain a finding of

22  liability.'" *Id.* (quoting *Havens*, 996 F.2d at 218). Moreover, "[a]n employer is only

1  liable under the Jones Act if the employer or its agents either *knew or should have known*

2  of the dangerous condition."  *Id.* at 663-64 (emphasis in original) (citing *Havens*, 996

3  F.2d at 218).

4    Here, Mr. Waters has plausibly pled that he is a seaman—and has therefore

5  established the "duty" element of his claim—because he alleges that he worked as a

6  crewmember on a vessel in navigation; Mr. Waters's work as a fisherman "contribute[d]

7  to the . . . accomplishment of [the Vessel']s mission"; and his connection to the Vessel

8  was substantial.  (Am. Compl. ¶¶ 5-6); *see Chandris*, 515 U.S. at 368.  Mr. Waters also

9  plausibly pleads that Mr. Mitchell knew or should have known that the stair was not

10  hinged before Mr. Waters fell on it (*see* Am. Compl. ¶¶ 9-10), and that Mr. Mitchell's

11  failure to secure the stair proximately caused Mr. Waters's injury (*id*. ¶ 9).  *See also*

12  *Ribitzki*, 111 F.3d at 662 (stating that "even the slightest negligence is sufficient to

13  sustain a finding of liability").  Accordingly, the substantive merits and sufficiency of Mr.

14  Waters's claim under the Jones Act weigh in favor of default judgment with respect to

15  this claim.

16    *b.  The Unseaworthiness Claim*

17    The maritime doctrine of unseaworthiness is a form of strict liability that requires

18  a vessel owner to ensure that a vessel and its equipment are "reasonably fit for her

19  intended service."  *Usner v. Luckenbach Overseas Corp.*, 400 U.S. 494, 499 (1971).  A

20  "claim of unseaworthiness . . . serves as a duplicate and substitute for a Jones Act claim."

21  *The Dutra Grp. v. Batterton*, __ U.S. __, 139 S. Ct. 2275, 2286 (2019).  A plaintiff

22  "cannot duplicate his recovery by collecting full damages on both claims because

1    whether or not the seaman's injuries were occasioned by the unseaworthiness of the

2    vessel or by the negligence of the master or members of the crew, . . . there is but

3    a . . . single legal wrong." *Id.* at 2282 (internal quotation marks omitted); *see also*

4    *Plamals v. The Pinar Del Rio*, 277 U.S. 151, 156-57 (1928) (reaching the same

5    conclusion).  Because Mr. Waters may recover for his injuries under his Jones Act

6    negligence claim, he cannot also recover for the same injury under a duplicative

7    unseaworthiness claim.[5]  Accordingly, the second and third *Eitel* factors weigh against

8    entry of default judgment on Mr. Waters's unseaworthiness claim.  The court will not

9    grant his motion with respect to this claim.

10         *c.  The Maintenance and Cure Claim*

11         The general maritime law entitles a seaman who falls ill or becomes injured

12   "while in the service of a ship" to "maintenance and cure" by his employer.  *Lipscomb v.*

13   *Foss Mar. Co.*, 83 F.3d 1106, 1109 & n.1 (9th Cir. 1996) (citing *Gardiner v. Sea-Land*

14   *Serv., Inc.*, 786 F.2d 943, 945-46 (9th Cir. 1986)).  "This right includes

15   (1) 'maintenance'—a living allowance for food and lodging to the ill seaman;

16   (2) 'cure'—reimbursement for medical expenses; and (3) 'unearned wages' from the

17   onset of injury or illness until the end of the voyage." *Id.* (citing *Gardiner*, 786 F.2d at

18   946) (stating that a seaman is entitled to the wages that he would have earned on the

19   voyage "but for his illness or injury, to the extent such determination may be made

20

21         [5] Regardless, Mr. Waters's unseaworthiness claim would also fail on the merits because it
     is predicated on a single act of negligence.  (*See* Am. Compl. ¶¶ 12-13); *Usner*, 400 U.S. at

22   499-500 ("To hold that this individual act of negligence rendered the ship unseaworthy would be
     to subvert the fundamental distinction between unseaworthiness and negligence.").

1    without speculation").  The entitlement to maintenance and cure continues until the

2    seaman reaches "maximum cure," or a recovery as complete as the injury allows.

3    *Permanente S.S. Corp. v. Martinez*, 369 F.2d 297, 298-99 (9th Cir. 1966).  "[T]he

4    shipowner's liability for maintenance and cure [is] among 'the most pervasive' of all

5    and . . . not to be defeated by restrictive distinctions nor 'narrowly confined.'"  *Vaughan*

6    *v. Atkinson*, 369 U.S. 527, 532 (1962) (quoting *Aguilar v. Standard Oil Co.*, 318 U.S.

7    724, 735 (1943)).  Any "ambiguities or doubts" must be "resolved in favor of the

8    seaman."  *Id*. (citing *Warren v. United States*, 340 U.S. 523 (1951)).

9         A shipowner is liable for maintenance and cure to a plaintiff who establishes the

10   following:  "(1) they were employed as seaman; (2) their injuries or illnesses occurred,

11   manifested, or were aggravated while in the ship's service; (3) the wages to which they

12   are entitled; and (4) expenditures for medicines, medical treatment, board, and lodging."

13   *Dean v. Fishing Co. of Alaska*, 300 P.3d 815, 821 (Wash. 2013).  However, a seaman

14   who stays with family to recover from his injury "incur[s] no expense or liability for his

15   care and support at the home of his parents," and may not recover lodging costs for that

16   time.  *Johnson v. United States*, 333 U.S. 46, 50 (1948); *see also Aadland v. Boat Santa*

17   *Rita II, Inc.*, 42 F.4th 34, 45 (1st Cir. 2022) ("[A] seaman who receives financial

18   assistance from his parent in the wake of his on-ship illness or injury does not thereby

19   incur an expense that is a 'charge' on the shipowner . . . .").  Additionally Attorney's fees

20   are awarded "upon a callous and willful finding."  *Clausen v. Icicle Seafoods, Inc.*, 272

21   P.3d 827, 832 (Wash. 2012) (citing *Vaughan*, 369 U.S. at 530).  And punitive damages

22   are available where the shipowner displays a "willful and wanton disregard of the

ORDER - 14

maintenance and cure obligation." *Atlantic Sounding Co., Inc. v. Townsend*, 557 U.S. 404, 424 (2009) (remanding to allow seaman to seek punitive damages where shipowner expressly disclaimed liability for maintenance and cure).

Here, Mr. Waters has plausibly alleged a claim for cure, but default judgment is not appropriate with respect to his prayers for punitive damages or maintenance for food and lodging costs. First, Mr. Waters has established his "seaman status" (*see supra* § III.C.2.a), and second, Mr. Waters has also plausibly alleged that he was injured while working on the Vessel (*see* Am. Compl. ¶ 8). Third, Mr. Waters plausibly alleges that he is entitled to unearned wages from July 4, 2018, when he was discharged, through July 31, 2018, when he would have finished the season. (4/1/22 Waters Decl. ¶¶ 7, 14; *see also infra* § III.D.2, 3.) Fourth, Mr. Waters establishes expenditures for medical care he received for his injuries. (*See* 4/1/22 Waters Decl. ¶¶ 8-10; *see also* Camai Invoice, Skagit Invoice.) Fifth, Mr. Waters asserts that the Mitchells' failure to fulfill their maintenance and cure obligations were "callous and willful" (4/1/22 Waters Decl. ¶ 6; Am. Compl. ¶ 25); the court finds this assertion plausible in light of Mr. Waters's factual allegations that the Mitchells denied his initial request for medical care and left him on a remote beach in Alaska (*see* Am. Compl. ¶¶ 18, 20-23). Accordingly, Mr. Waters's claim for maintenance and cure is legally sufficient with respect to his prayers for unearned wages, the costs of medical care, and reasonable attorney's fees incurred in pursuing this claim. *See TeleVideo*, 826 F.2d at 917-18.

However, Mr. Waters' claim is legally insufficient with respect to his prayers for lodging, food, and punitive damages. Mr. Waters may not recover food and lodging costs

1    for the months he spent at his parents' home under a claim for maintenance and cure.

2    (*See* 4/1/22 Waters Decl. ¶ 11 (estimating food costs at $400 per month and lodging costs

3    at $800 per month); *see* Mot. at 12); *see also Johnson*, 333 U.S. at 50 (prohibiting seaman

4    who stayed with his parents from recovering lodging costs).  In support of his claim for

5    punitive damages, Mr. Waters argues, at length, that his dissatisfaction with the quality of

6    medical treatment at Skagit Valley Hospital justifies punitive damages and that the

7    Mitchells had a duty to "supervise [his] care."  (*See* Mot. at 12-14; *see also* 4/1/22 Waters

8    Decl. ¶ 10 (speculating that he "would have obtained more and better medical treatment

9    if defendant had helped [him] find actual doctors")).)  But Mr. Waters offers no legal

10   authority in support of his arguments that a shipowner must "supervise" a seaman's care,

11   as opposed to simply paying its costs.  (*See* Mot. at 12-14.)  Therefore, Mr. Mitchell's

12   requests for food and lodging costs and punitive damages are legally deficient and not

13   recoverable on his present motion.  *See TeleVideo*, 826 F.2d at 917-18.

14        *d.  The WRA Claim*

15        Washington law evinces a "strong policy in favor of payment of wages due

16   employees."  *Schilling v. Radio Holdings, Inc.*, 961 P.2d 371, 374 (Wash. 1998).  The

17   WRA allows employees to recover unpaid wages, litigation costs, and attorney's fees,

18   and, where the employer failed to pay wages "wilfully and with the intent to deprive the

19   employee of any part of his or her wages," the employee may recover punitive damages

20   equal to twice the amount of wages owed.  *See* RCW 49.52.050(2), .070.  "The

21   nonpayment of wages is willful 'when it is the result of a knowing and intentional

22   action.'"  *Schilling*, 961 P.2d at 375 (quoting *Lillig v. Becton-Dickinson*, 717 P.2d 1371

(Wash. 1986)).  A failure to pay wages is not willful, by contrast, when it was due to carelessness, such as a clerical error, or a bona fide dispute regarding the amount due or the employer's obligation to pay.  *Id*. at 375-76.  A "bona fide dispute" is one that is fairly debatable.  *Id*. at 376.

Here, Mr. Waters alleges that he was never paid for any work performed on the Vessel, although he had a verbal agreement with Mr. Mitchell to earn a portion of the Vessel's gross receipts from the Bristol Bay sockeye season, less costs for fuel, taxes, and gear loss.  (*See* 4/1/22 Waters Decl. ¶ 2.)  Mr. Waters argues the Mitchells' failure to pay these wages was willful.  (Mot. at 6 (citing *Schilling*, 961 P.2d 371).)  The court finds this allegation plausible in light of Mr. Waters's verbal employment agreement and his allegation that he received no pay for his work on the Vessel.  (*See* Am. Compl. ¶¶ 20-23.)  Accordingly, Mr. Mitchell has asserted a legally sufficient claim to recover unpaid wages, punitive damages, and attorney's fees under the WRA.

> 3.    The Sum of Money at Stake in Relation to the Mitchells' Behavior

The fourth *Eitel* factor weighs in favor of default when "the recovery sought is proportional to the harm caused by defendant's conduct."  *Landstar Ranger, Inc. v. Parth Enters., Inc*., 725 F. Supp. 2d 916, 921 (N.D. Cal. 2010).  When the amount at stake is substantial or unreasonable considering the allegations in the complaint, default judgment is disfavored.  *See Eitel*, 782 F.2d at 1472 (affirming the denial of default judgment where the plaintiff sought $3 million in damages and the parties disputed material facts in the pleadings).  "However, when the sum of money at stake is tailored to the specific

1    misconduct of the defendant, default judgment may be appropriate." *Yelp Inc. v. Catron*,

2    70 F. Supp. 3d 1082, 1100 (N.D. Cal. 2014).

3         Mr. Waters seeks a total of $214,657.00 in damages for his claims, including

4    $30,000.00 in punitive damages.  (*See* Mot. at 17.)  In general, default judgment is

5    disfavored if there are large sums of money involved, *Eitel*, 782 F.2d at 1472, and other

6    courts have found requests for lesser amounts of money to weigh against the entry of

7    default judgment, *see, e.g.*, *Joe Hand Promotions, Inc. v. Alavardo*, No. 1:10-cv-00907

8    LJO JLT, 2011 WL 1544501, at *7-8 (E.D. Cal. Apr. 21, 2011) ("Given the substantial

9    amount of money at stake [(up to $110,000)], this factor weighs against the entry of

10   default judgment."); *J&J Sports Prods. v. Cardoze*, No. C 09-05683 WHA, 2010 WL

11   2757106 (N.D. Cal. July 9, 2010) (stating that "a large sum of money at stake would

12   disfavor default damages," such as damages totaling $114,200.00).  Moreover, as

13   discussed below, Mr. Waters has failed to provide sufficient evidentiary support for his

14   alleged damages.  (*See infra* § III.D.)  Accordingly, the court cannot conclude that the

15   damages Mr. Waters seeks are reasonable in light of the potential loss caused by the

16   Mitchells' actions.  *See, e.g.*, *Truong Giang Corp. v. Twinstar Tea Corp.*, No.

17   06-CV-03594, 2007 WL 1545173, at *12 (N.D. Cal. May 29, 2007) (concluding that the

18   factor weighed against default because the sum sought was unsupported by evidence in

19   the record).  This factor weighs against entry of default judgment.

20        4.    The Possibility of a Dispute Concerning Material Facts

21        Where, as here, the defendants have defaulted, the court must therefore accept as true

22   all well-pleaded allegations in the complaint, other than those related to damages.  *See*

1    *TeleVideo*, 826 F.2d 917-18.  Because the Mitchells have admitted the allegations in the

2    complaint by failing to appear or defend this action (*see* 10/26/22 Order), there is nothing

3    to suggest a possible dispute of material facts in this case, and this factor weighs in favor

4    of granting default judgment.

5           5.      Whether Default was Due to Excusable Neglect

6           The sixth *Eitel* factor considers the possibility that the defendant's default resulted

7    from excusable neglect.  *PepsiCo*, 238 F. Supp. 2d at 1177.  Certain circumstances

8    surrounding a party's failure to respond may constitute excusable neglect and weigh

9    against default judgment.  *See, e.g.*, *Eitel*, 782 F.2d at 1472 (finding defendant's failure to

10   answer due to excusable neglect where the parties reached a settlement agreement prior

11   to the deadline to answer).  However, excusable neglect may "be lacking where a

12   defendant was properly served with the complaint and notice of default judgment."

13   *Indian Hills Holdings, LLC v. Frye*, 572 F. Supp. 3d 872, 889-90 (S.D. Cal. 2021).  Here,

14   there is nothing to indicate that the Mitchells' default was due to excusable neglect

15   because the Mitchells were properly served with Mr. Waters's original and amended

16   complaints and received notice of Mr. Waters's intent to move for default judgment—for

17   the second time in as many years—twelve days before he filed this motion.  (*See supra*

18   n.6; *see also* Dkt.)  This factor therefore weighs in favor of default judgment.

19          6.      The Preference for Decisions on the Merits

20          Although there is a preference for deciding cases on the merits, this preference is

21   not absolute.  *See Vawter v. Quality Loan Serv. Corp. of Wash.*, No. C09-1585JLR, 2011

22   WL 1584424, at *3 (W.D. Wash. Apr. 27, 2011).  Where, as here, the defendant's

"failure to answer [a c]omplaint makes a decision on the merits impractical, if not

impossible," the "preference to decide cases on the merits does not preclude [t]he court

from granting default judgment." *PepsiCo*, 238 F. Supp. 2d at 1177.  The Mitchells'

repeated failures to answer Mr. Waters's complaints makes adjudication on the merits

impossible.  *See Bd. of Trs. of the Sheet Metal Workers Health Care Plan of N. Cal. v.*

*Gervasio Envtl. Sys.*, No. C03-04858, 2004 WL 1465719, at *2 (N.D. Cal. May 21, 2004)

("Although federal policy may favor decisions on the merits, Rule 55(b) permits entry of

default judgment in situations, such as this, where the defendant refuses to litigate.").

The court concludes that the seventh *Eitel* factor does not preclude default judgment.

       7.   <u>Summary</u>

     On balance, the *Eitel* factors weigh in favor of default judgment.  Although the

amount of money Mr. Waters seeks is not reasonable in light of the potential loss caused

by the Mitchells' actions, the other factors weigh in favor of default judgment with

respect to Mr. Waters's Jones Act negligence claim, WRA claim, and claim for

maintenance and cure.  Accordingly, the court will grant default judgment with respect to

Mr. Waters's meritorious claims and award appropriate damages.

**D.   Mr. Waters's Recovery**

     "A default judgment must not differ in kind from, or exceed in amount, what is

demanded in the pleadings."  Fed. R. Civ. P. 54(c); *see also Henry v. Sneiders*, 490 F.2d

315, 317, 317 n.2 (9th Cir. 1974) (noting that a plaintiff need not specify an exact amount

in his complaint in order to comply with Rule 54(c)'s requirement and prevail on a

motion for default judgment).  The district court need not accept as true allegations

1    regarding the amount of damages at this phase.  *See TeleVideo*, 826 F.2d at 917.

2    Therefore, Mr. Waters must present evidence to "prove up" the damages he seeks.  *Amini*

3    *Innovation Corp. v. KTY Int'l Mktg.*, 768 F. Supp. 2d 1049, 1053-54 (C.D. Cal. 2011);

4    Fed. R. Civ. P. 55(b); Local Rules W.D. Wash. LCR 55(b)(2).

5        Here, the damages Mr. Waters seeks to recover do not differ from the relief

6    requested in his complaint.  (*Compare* Am. Compl. at 6, *with* Mot. at 17.)  The court

7    reviews each category of damages sought to determine whether Mr. Waters has met his

8    burden to "prove up" the damages he seeks.  *See Amini*, 768 F. Supp. 2d at 1053-54.

9        1.    The Jones Act Negligence Claim

10        To compensate him for the Mitchells' negligence, Mr. Waters seeks damages for

11    lost wages, future lost earnings, and pain and suffering.  (*See* Mot. at 15-16.)  First, Mr.

12    Waters seeks $45,396.00 in lost wages to date.  (*Id.*)  Mr. Waters calculates his lost

13    wages to date by comparing his income in 2015, the most recent year for which he filed

14    taxes, to his income in 2019, 2020, and 2021, after the 2018 injury.  (*Id*. at 15.)  Mr.

15    Waters's 2015 tax return indicates that he earned $24,349.00, of which $2,124.00 was

16    unemployment compensation.  (4/1/22 Waters Decl. ¶ 24; 1st Mot., Ex. 11 ("2015 Tax

17    Return").)  Mr. Waters estimates that he earned a total of $2,500 in 2019 and the same

18    amount in 2020.  (4/1/22 Waters Decl. ¶ 24.)  Mr. Waters states that in 2021, he earned

19    $20,651.00 when he returned to commercial fishing and working odd jobs.  (*Id*. ¶ 25;

20    Mot. at 15.)  Mr. Waters therefore argues that he lost $20,849.00 (or $24,349.00 less

21    $2,500.00) in wages in 2019 and the same amount in 2020 because his injury prohibited

22    him from working.  (4/1/22 Waters Decl. ¶ 24.)  Mr. Waters also subtracts his 2021

1    income from his 2015 reported income and concludes that his lost wages for 2021 totaled

2    $3,698.00.  (Mot. at 15; 4/1/22 Waters Decl. ¶ 25.)

3          Mr. Waters's calculations and rational are deficient in several ways.  First, Mr.

4    Waters does not explain why the court should include the $2,124.00 in unemployment

5    compensation he received in 2015 in its assumption of the income Mr. Waters would

6    have earned but for his injury.  (*See generally* Mot.; *see also* 2015 Tax Return.)  Second,

7    Mr. Waters does not substantiate his argument that the Mitchells' alleged negligence is to

8    blame for his relatively lower earnings in 2021 compared with 2015.  (*See generally*

9    Mot.; 4/1/22 Waters Decl.)  Mr. Waters does not argue that his injury limited his 2021

10   earnings.  (*See* Mot. at 15 (stating "he was able to return to a fishing job with a friend

11   tolerating his limitations and to do some odd jobs.").)  The court therefore declines to

12   include the unemployment compensation in its calculation of Mr. Waters's 2019 and

13   2020 lost earnings and declines to find any lost earnings in 2021 attributable to the

14   Mitchells' conduct.  *See Landstar Ranger*, 725 F. Supp. 2d at 921.  Accordingly, the

15   court AWARDS Mr. Waters $39,450.00 in lost wages to date for his negligence claim

16   under the Jones Act.

17         Second, Mr. Waters seeks $11,094.00 in lost future earnings or diminished earning

18   capacity due to the injury.  (Mot. at 15-16.)  Mr. Waters arrives at this sum by

19   multiplying his alleged loss in 2021 (of $3,698.00) by three.  (*Id*. at 16.)  But Mr. Waters

20   again fails to attribute any future lost earnings to his injury or the Mitchells' conduct, and

21   cannot base his request for such an award on a loss he does not attribute to his injury.

22

1   (*See generally id.*; 4/1/22 Waters Decl.[6])  The court therefore DECLINES to award

2   damages for future lost earnings.

3        Third, Mr. Waters seeks $30,000 in pain and suffering for the injury, asserting that

4   he has had to limit his physical activity and occasionally loses sleep due to pain caused

5   by the injury.  (Mot. at 16.)  Mr. Waters also notes that he is still relatively young, and at

6   37 years old, he will need to endure the consequences of the injury for many years to

7   come.  (4/1/22 Waters Decl. ¶ 29.)  However, Mr. Waters also asserts that he has not

8   received medical care for his injury since his visits to Skagit Valley Hospital in July 2018

9   and does not account for the impact of his refusal to seek medical treatment for nearly

10  five years on his continued pain and suffering.  (*See id*. ¶ 10; 4/24/23 Waters Decl. ¶ 6.)

11  The court, therefore, concludes that $30,000.00 is not proportional to the pain and

12  suffering allegedly caused by the Mitchells' negligence.  Instead, the court AWARDS

13  Mr. Waters $10,000.00 for pain and suffering.

14        2.    The WRA Claim

15        Mr. Waters alleges he was owed $14,123.00 for crew work performed until his

16  ejection from the Vessel on July 4, 2018.  (Mot. at 5-6; 4/1/22 Waters Decl. ¶¶ 5-6.)  Mr.

17  Waters seeks $14,123.00 in wages, an additional $28,246.00 in punitive damages, and

18  $5,600 in attorney's fees for this claim.  (Mot. at 11; 4/24/23 Luhrs Decl. ¶ 9.)

19

20

21        [6] In fact, Mr. Waters acknowledges that his income in 2022 and 2023 from selling used
    cars and community solar systems exceed his earnings as a seaman.  (4/1/22 Waters Decl. ¶ 26;
22  4/24/23 Waters Decl. ¶ 5.)  Mr. Waters speculates that he may be unable to sustain these jobs but
    does not adequately explain why the Mitchells are to blame for his uncertainty.  (*See* Mot. at 16.)

1    According to Mr. Waters, his verbal agreement with Mr. Mitchell provided that he

2    would be compensated with "a crew share of 12% of gross receipts from sale of fish

3    minus fish landing taxes, fuel, and gear loss, through the Bristol Bay sockeye season."

4    (*See* 4/1/22 Waters Decl. ¶ 2.)  Mr. Waters estimates that the crew had landed at least

5    100,000 pounds of Bristol Bay sockeye by July 4, 2018, but does not provide evidence to

6    support this estimate.  (*See id.* ¶ 5; *see generally* Mot.; 4/1/22 Luhrs Decl.)  Mr. Waters

7    asserts the wholesale price of Bristol Bay sockeye was $1.26 per pound in 2018 (*see*

8    4/1/22 Waters Decl. ¶ 5; 1st Mot., Ex. 2) and therefore estimates the Vessel would have

9    brought in a total of $126,000 in gross receipts for the period when he was working

10   (4/1/22 Waters Decl. ¶ 5).  Mr. Waters further asserts the fish landing tax was assessed at

11   4% that year, for a total of $5,040, and estimates the costs of fuel and a lost fishing net

12   were $3,000 and $270, respectively.  (*Id.* ¶¶ 2, 6 & n.2 (first citing 1st Mot., Ex. 3; and

13   then citing *id.*, Ex. 4).)  Therefore, Mr. Waters calculates that his 12% crew share of

14   $126,000 gross receipts, less $5,040 in fish landing taxes, $3,000 in fuel, and $270 in

15   gear loss totals $14,122.80.

16   As discussed above, Mr. Waters introduces his 2015 income as a reasonable

17   estimate of the income he believes he would have earned in 2018, 2019, and 2020, absent

18   his injury.  (*See supra* § III.D.1; 2015 Tax Return.)  According to Mr. Waters, of the

19   $24,349.00 he earned in 2015, $13,228.00 was from a construction job and the 2015 Tax

20   Return shows $2,124.00 was from unemployment compensation, leaving only $8,997.00

21   in income from commercial fishing.  (*See* 2015 Tax Return; 4/1/22 Waters Decl. ¶ 21.)  If

22   Mr. Waters's 2015 income is a reasonable estimate of his expected income for 2018, then

it is not reasonable to estimate that he would have earned $14,122.80 for half of the 2018

sockeye season.  If Mr. Waters has evidence to substantiate his estimate that the crew had

grossed $126,000 in sockeye before his July 4, 2018 departure, he has not presented it to

the court, and the court need not accept his allegations regarding these damages as true.

(*See generally* Mot.; 4/1/22 Waters Decl.; 4/1/22 Luhrs Decl.); *see TeleVideo*, 826 F.2d at

917.  The only reasonable conclusion the court can reach based on the evidence and

arguments before it is that Mr. Waters likely earned $4,498.50—an amount equal to half

of his 2015 commercial fishing earnings—for the first half of the 2018 season.

The court has already concluded that Mr. Waters has established the Mitchells'

failure to pay his wages was willful and may therefore recover punitive damages for his

claim under the WRA.  (*See supra* § III.D.2.d.)  Mr. Waters seeks a total of $28,246.00 in

punitive damages under the statute, or twice his estimated unpaid wages, for a total

recovery of three times his estimated unpaid wages.  (*See* Mot. at 17.)  However, Mr.

Waters does not present any argument to justify a departure from Washington courts'

established practice under the WRA of awarding a prevailing plaintiff his unpaid wages

and an equal amount in punitive damages, for a total recovery of twice the amount owing.

(*See generally* Mot.); *see, e.g.*, *Schilling*, 961 P.2d at 373, 378 (affirming trial court's

award of $13,955 in unpaid wages and $13,955 in punitive damages); *Fiore v. PPG*

*Indus., Inc.*, 279 P.3d 972, 977 (2012) (affirming trial court's award of unpaid wages and

punitive damages in the same amount pursuant to the WRA).  The court declines to

depart from this practice.  The court therefore AWARDS Mr. Waters $4,498.50 in unpaid

wages and $4,498.50 in punitive damages for his WRA claim.

3.      The Claim for Maintenance and Cure

As discussed above, Mr. Waters has plausibly alleged that the Mitchells are liable for his unearned wages and medical care costs under the maritime doctrine of maintenance and cure.  (*See supra* § III.C.2.c.)  Mr. Waters seeks $14,123.00 in unearned wages (*see* 4/1/22 Waters Decl. ¶ 14.), estimating that he would have earned the same amount of money between July 4 and 31, 2018 as he believes he earned for work performed before his July 4, 2018 ejection (*see id.* ("I base this [estimate] on the fact that the fishing was good leading up to 7/4/18 and was expected to remain strong for several weeks after that, so that my crew share after July 4, 2018, would have been about the same as it was up to July 4, 2018.")).  Because Mr. Waters fails to substantiate this estimate to the court's satisfaction (*see supra* § III.D.2), the court declines to award Mr. Waters the $14,123.00 he seeks.  However, because the court finds it plausible that Mr. Waters would have earned the same amount of wages during the second half of the fishing season in the absence of his injury and July 4, 2018 departure,[7] Mr. Waters may recover unearned wages equal to the amount of unpaid wages he would have earned prior to July 4, 2018, for a total of $4,498.50.  (*See id.*).

Mr. Waters provides invoices for healthcare he received at the Camai Clinic and Skagit Valley Hospital for his injury aboard the Vessel, for a total of $2,612.00 ($208.00 from the Camai Clinic and $2,404.00 from Skagit Valley Hospital).  (*See* Camai Invoice,

---

[7] Mr. Waters does not specify his start date (*see* Am. Compl. ¶ 6 (stating his employment began May or June 2018)), but the Bristol Bay sockeye season begins June 1 by regulation, *see* 5 AAC 06.310.  Therefore, Mr. Waters likely worked roughly as many days of the season as he missed and may recover unearned wages in an amount equal to his earned wages.

Skagit Invoice.)  The court concludes these expenses are recoverable and AWARDS Mr. Waters $4,498.50 in unearned wages and $2,404.00 for medical expenses for his maintenance and cure claim.

Because the court determined that Mr. Waters's maintenance and cure claim is legally deficient with respect to his prayers for punitive damages, food, and lodging costs, the court declines to award corresponding damages.  (*See supra* § III.C.2.c.)

4. <u>The Request for Attorney's Fees.</u>

In order to recover attorney's fees, Mr. Waters must establish that (1) the law entitles him to recover attorney's fees; (2) his attorney's hourly rate is reasonable; and (3) the number of hours spent was reasonable.  The court reviews the first two elements before turning to the third.

*a. Mr. Waters's Entitlement to Fees and Mr. Luhrs's Hourly Rate*

Mr. Waters seeks a total of $12,250.00 in attorneys' fees for Mr. Luhrs's work on his WRA and maintenance and cure claims.  (Mot. at 17.)  The court agrees with Mr. Waters that his meritorious claims for maintenance and cure and under the WRA entitle him to reasonable attorney's fees.  *See Clausen*, 272 P.3d at 832 (allowing seamen to recover attorney's fees for shipowner's "callous and willful" denial of maintenance and cure); RCW 49.52.050(2).

Mr. Waters states that Mr. Luhrs has accepted his case on contingency and their agreement provides that Mr. Waters will pay Mr. Luhrs 40% of his recovery.  (4/1/22 Waters Decl. ¶ 32.)  Mr. Luhrs states that his hourly rate is $350 per hour.  (4/1/22 Luhrs Decl. ¶ 8.)  An attorney's hourly rate is reasonable if it does not substantially exceed "the

rate prevailing in the community for similar work performed by attorneys of comparable skill, experience, and reputation." *Chalmers v. City of Los Angeles*, 796 F.2d 1205, 1210-11 (9th Cir. 1986). Courts use the rates of attorneys practicing in the forum district for comparison. *See Gates v. Deukmejian*, 987 F.2d 1392, 1405-06 (9th Cir. 1992); *see also Ingram v. Oroudjian*, 647 F.3d 925, 928 (9th Cir. 2011) (noting that court may rely on its own knowledge and experience regarding fees charged in the area in which it presides). Based upon the court's familiarity with the rates charged by attorneys in Seattle, the court concludes Mr. Luhrs's hourly rate of $350 is reasonable. *See, e.g., HDT Bio Corp. v. Emcure Pharms., Ltd.*, No. C22-0334JLR, 2022 WL 17668036, at *2 (W.D. Wash. Dec. 14, 2022) (approving hourly rates as high as $800).

   *b. Whether the Hours Spent were Reasonable*

   An attorney spends a reasonable number of hours if "in light of the circumstances, the time could reasonably have been billed to a private client." *Moreno v. City of Sacramento*, 534 F.3d 1106, 1111 (9th Cir. 2008). The hours claimed by a party may be reduced by the court if "the documentation of the hours is inadequate" or "if the hours expended are deemed excessive or otherwise unnecessary." *Chalmers*, 796 F.2d at 1210. The requesting party must "document[] the appropriate hours expended in the litigation and . . . submit evidence in support of those hours worked." *Welch v. Metro Life Ins. Co.*, 480 F.3d 942, 948 (9th Cir. 2007) (citing *Gates*, 987 F.2d at 1397). Although counsel may "just barely" discharge this burden by "listing his hours and identifying the general

1  subject matter of his time expenditures," when he submits block-billed[8] or otherwise

2  "poorly documented" evidence in support of a fee request, the court may reduce the fee

3  award. *Fischer v. SJB-P.D. Inc.*, 214 F.3d 1115, 1121 (9th Cir. 2000) (internal citations

4  omitted); *Banas v. Volcano Corp.*, 47 F. Supp. 3d 957, 969 (N.D. Cal. 2014) (reducing

5  fee award by 25% because time entries were "somewhat vague, rendering it difficult to

6  determine what the timekeeper was actually doing").

7         Mr. Waters does not supply the court with billing records or time entries.  (*See*

8  *generally* Dkt.)  Instead, Mr. Luhrs asserts in his declarations that he "expended at least

9  six (6) hours" on Mr. Waters's wage claim (4/1/22 Luhrs Decl. ¶ 10), "expended at least

10  nine (9) hours" on Mr. Waters's maintenance and cure claim (*id.* ¶ 11), and spent "at least

11  twenty (20) hours researching and drafting Amended Complaint and the Second Request

12  for Default Judgment" (4/24/23 Luhrs Decl. ¶ 9).  (*See also id*. ¶ 10 (stating he "did a

13  somewhat arbitrary allocation" of the hours spent on the amended complaint and renewed

14  motion for default judgment to exclude hours spent on claims for which Mr. Waters

15  cannot recover attorney's fees).)  These conclusory statements do not allow the court to

16  verify that the amount of time spent was reasonable and necessary to litigate Mr.

17  Waters's claims.[9]  *See Fischer*, 214 F.3d at 1121.  Accordingly, the hours expended in

18  connection with this litigation are not reasonable and the court will reduce the hours

19

20       [8] Block-billing is "a time-keeping method by which each lawyer . . . enters the total daily time spent working on a case, rather than itemizing the time expended on specific tasks." *Welch*,

21  480 F.3 at 945 n.2 (internal citation omitted)).

22       [9] Nor does the court believe Mr. Luhrs would or could submit a similarly formatted bill to a client and manage to recover payment. *See Moreno*, 534 F.3d at 1111.

expended by 30% because of the vagueness of Mr. Luhrs' "time entries." *See Banas*, 47 F. Supp. 3d at 969; *Chalmers*, 796 F.2d at 1210.

The court applies a 30% reduction to Mr. Luhrs' hourly total and multiplies that value by his hourly rate, for a total lodestar figure of $8,575.00. *See, e.g.*, *Camacho v. Bridgeport Fin., Inc.*, 523 F.3d 973, 977-78 (9th Cir. 2008) (describing the "lodestar" method courts use to determine if the requested fees are reasonable and noting that the lodestar figure is presumptively reasonable). The court concludes that this lodestar figure represents a reasonable award of Mr. Waters's attorney's fees for the work reasonably performed by counsel in connection with WRA and maintenance and cure claims. Accordingly, the court AWARDS Mr. Waters $8,575.00 in attorney's fees.

## IV.   CONCLUSION

For the foregoing reasons, the court GRANTS in part and DENIES in part Mr. Waters's motion for default judgment (Dkt. # 28). The court GRANTS default judgment with respect to Mr. Waters's claims for negligence under the Jones Act, maintenance and cure, unpaid wages under the WRA. The court DENIES Mr. Waters's motion with respect to his claim for unseaworthiness. The court AWARDS Mr. Waters a total of **$73,924.50** as follows:

(1) **$39,450.00** in lost wages to date and **$10,000.00** in pain and suffering damages for his negligence claim under the Jones Act

(2) **$4,498.50** for unpaid wages and **$4,498.50** in punitive damages for his WRA claim;

1   (3) **$4,498.50** for unearned wages and **$2,404.00** for healthcare costs for his

2        maintenance and cure claim; and

3   (4) **$8,575.00** in attorney's fees for Mr. Waters's WRA claim and claim for

4        maintenance and cure.

5   Dated this 8th day of May, 2023.

6

7

8   JAMES L. ROBART
    United States District Judge

9

10

11

12

13

14

15

16

17

18

19

20

21

22